United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 2, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 04-60975

_____

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO,
Local Unions Nos. 605 & 985; LARRY BRIDGES; JOYCE RILEY

Plaintiffs - Appellees

v.

MISSISSIPPI POWER & LIGHT CO

Defendant - Appellant

_____

Appeal from the United States District Court for the
Southern District of Mississippi

_____

Before KING, BARKSDALE, and CLEMENT, Circuit Judges.

KING, Circuit Judge:

On behalf of and along with two of their individual members, Local Unions 605 and 985 of the International Brotherhood of Electrical Workers, plaintiffs-appellees, filed suit against defendant-appellant Mississippi Power & Light Company, alleging that Mississippi Power & Light had engaged in employment practices with a racially disparate impact. Following a bench trial, the district court found that the challenged employment practices had an unlawful disparate impact, as defined by 42 U.S.C. § 2000e-2(k)(1), on Mississippi Power & Light's African-

1

American employees and potential employees.  The district court awarded lost wages to the individual plaintiffs-appellees, Larry Bridges and Joyce Riley, and attorneys' fees to plaintiffs-appellees' trial counsel.  The district court also directed Mississippi Power & Light to reform its challenged employment practices.  Mississippi Power & Light then filed this appeal. For the following reasons, we REVERSE and RENDER judgment in favor of Mississippi Power & Light.

## I. BACKGROUND

### A.   Factual History

The two individual plaintiffs-appellees, Larry Bridges ("Bridges") and Joyce Riley ("Riley"), began working for defendant-appellee Mississippi Power & Light Company ("MP&L") before it was acquired by Entergy, Inc. ("Entergy").[1]  During their employment with MP&L, Bridges and Riley were also members of the International Brotherhood of Electrical Workers.  Local Unions 605 and 985 of the International Brotherhood of Electrical Workers (collectively, "IBEW") are the other two plaintiffs-appellees.[2]  After several years of service, Bridges and Riley,

---

[1]     Although Entergy is an entity holding operating companies similar to the former MP&L in several states, because MP&L is the named party, and following the example of the district court and the parties, we will frequently refer to MP&L alone in the remainder of this opinion, even when discussing events that occurred after Entergy acquired MP&L.

[2]     Collectively, the plaintiffs-appellees will be referred to as "the Plaintiffs."

both African Americans, were laid off in 1995 due to a general reduction across MP&L's workforce.[3] The circumstances surrounding these layoffs gave rise to the Plaintiffs' lawsuit.

At the time of these layoffs, IBEW and MP&L had reached a collective bargaining agreement which permitted laid-off employees with a certain measure of seniority to "bump" into positions held by more junior employees, provided the senior employees could qualify for the new positions. After they were laid off, both Bridges and Riley attempted to bump into "Storekeeper" and "Plant Storekeeper" positions which were covered by the relevant provisions of the collective bargaining agreement.[4] To qualify for the positions, however, Bridges and Riley had to pass a validated aptitude test known as the Clerical Aptitude Battery ("CAB," "test," or "CAB test").[5] After taking the test, both Bridges and Riley failed to meet the cutoff score set by MP&L, and neither was allowed to bump into the Storekeeper

---

[3] Both Bridges and Riley were subsequently rehired, albeit for positions other than those at issue. Both remained in MP&L's employ at the time the district court rendered its decision.

[4] Prior to these layoffs, Bridges and Riley were both employed by MP&L as electric metermen.

[5] The CAB is produced by the Edison Electric Institute ("EEI"), which is responsible for validating the test by establishing the statistical correlation between success on the test and success on the jobs for which the test is given. EEI also provides suggested scores and ranges to individual employers, and it requires individual employers to be certified to conduct the test. Once certified, an individual employer may set and vary its own cutoff scores.

positions.

This case is somewhat unusual because the validity of the CAB test itself was never directly questioned; rather, the Plaintiffs argued that MP&L's method of setting the cutoff scores for the Storekeeper positions at issue was the unlawful cause of the disparate impact. MP&L's testing policy can be broken into three separate time periods: from 1984 to 1989; from 1989 to 1993; and from 1993 to the time of the trial in 1999. From 1984 to 1989 MP&L used a cutoff score of 178 for the Storekeeper positions, based on EEI's recommendation. From 1989 to 1993 MP&L used a cutoff score of 150. By MP&L's admission, this shift was also based on EEI's recommendation, after MP&L reported significant amounts of turnover in the Storekeeper positions and the difficulty encountered by its applicant pool in passing the CAB. In 1993, following its acquisition by Entergy, MP&L raised its cutoff score to 180 for the Storekeeper positions, motivated in part by the desire to create uniformity with Entergy's other divisions. Therefore, at the time Bridges and Riley attempted to bump into the Storekeeper positions, the cutoff score was set at 180. The circumstances surrounding this 1993 shift shaped the core issues of the underlying suit and this appeal.

**B.   Procedural Posture**

The Plaintiffs filed suit pursuant to 42 U.S.C. § 2000e-2,[6] which proscribes, inter alia, those employment practices with a disparate and adverse impact upon protected classes which cannot be justified by an employer's legitimate business needs. At trial, the Plaintiffs contended that the 1993 increase in the cutoff score from 150 to 180 had a significant adverse and disparate impact on African-American applicants for the Storekeeper positions. MP&L responded by arguing that its decision to raise the cutoff score was justified by business necessity. The parties presented evidence and arguments during the course of a bench trial on May 17-20, 1999, and the district court rendered its judgment for the Plaintiffs on September 30, 2004, directing MP&L to amend its employment practices, awarding the individual plaintiffs lost wages, and awarding the Plaintiffs attorneys' fees.[7] MP&L appeals from this judgment.

## II. DISCUSSION

Ordinarily, this court reviews a district court's legal conclusions de novo and its findings of fact under the clearly erroneous standard. See, e.g., Davis v. City of Dallas, 777 F.2d

---

[6] In reference to its origins in the 1964 Civil Rights Act, Pub. L. No. 88-352, 78 Stat. 241 (1964), and in keeping with common usage, 42 U.S.C. § 2000e-2 will be referred to as "Title VII."

[7] Neither party was able to explain the district court's delay of more than five years between the date of trial and the day on which the district court rendered its decision, a delay which seems to us to be wholly unacceptable.

205, 208 n.1 (5th Cir. 1985).  However, when, as here, this court finds that a district court's findings were based "'upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard.'"  Walker v. City of Mesquite, 169 F.3d 973, 982 (5th Cir. 1999) (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 855 n.15 (1982)).

We begin our inquiry, of course, with the plain language of the governing statute.  Moore v. Cain, 298 F.3d 361, 366 (5th Cir. 2002).  "An unlawful employment practice based on disparate impact" is established under 42 U.S.C. § 2000e-2(k)(1)(A) only when

> (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related . . . and consistent with business necessity; or (ii) the complaining party makes . . . [a] demonstration . . . [of an acceptable] alternative employment practice and the respondent refuses to adopt such alternative employment practice.

42 U.S.C. § 2000e-2(k)(1)(A)(i), (ii) (2000) (emphasis added). The plain language of the statute shows that the burden of demonstrating acceptable alternative employment practices, set forth in § 2000e-2(k)(1)(A)(ii), is one that rests upon Title VII plaintiffs, not defendants.  Id.

This direct and unambiguous statutory language reflects the clear intent of Congress.  Congress set forth this framework for

6

disparate impact suits as part of the Civil Rights Act of 1991. See Pub. L. No. 102-166, § 105, 105 Stat. 1071, 1074-75 (1991) (adding § 2000e-2(k)(1)(A) to Title VII).  In the 1991 Civil Rights Act's statement of formal purposes, Congress stated its intent to "provide statutory guidelines for the adjudication of disparate impact suits" under Title VII and "to codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424 (1971), and in the other Supreme Court decisions prior to Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989)."  Id. § 3, 105 Stat. at 1071.

An examination of the Supreme Court's disparate impact decisions before Wards Cove reveals that Congress succeeded in its intent to codify their framework for disparate impact suits in 42 U.S.C. § 2000e-2(k)(1)(A)(i) and (ii).[8]  Again, this framework plainly establishes that the burden of demonstrating acceptable alternative business practice evidence is one that rests upon Title VII plaintiffs, not defendants.  Shortly after Griggs, the Supreme Court clarified the structure and allocation

_____

[8]     Congress specifically revived the standard for demonstrations of alternative business practices that prevailed before Wards Cove in the 1991 Civil Rights Act, adding § 2000e-2(k)(1)(C) to Title VII, which states that the alternative practices "demonstration referred to by subparagraph [§ 2000e-2(k)(1)](A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of 'alternative employment practice.'"  Pub. L. No. 102-166, § 105, 105 Stat. at 1074.  Wards Cove was decided on June 5, 1989.

7

of burdens in Title VII cases thusly:

> [a defendant-employer's business necessity] burden arises, of course, only after the complaining party or class has made out a prima facie case of discrimination . . . . <u>If an employer does then meet the burden of proving that its tests are 'job related,' it remains open to the complaining party to show that other tests or selection devices</u>, without a similarly undesirable racial effect, <u>would also serve</u> the employer's legitimate interest . . . .

<u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 425 (1975) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 801-05 (1973)) (internal citations omitted) (emphasis added).[9]  The same structure and allocation of burdens were consistently reiterated by the Supreme Court during the time period between <u>Griggs</u> and <u>Wards Cove</u>.  In <u>Dothard v. Rawlinson</u>, 433 U.S. 321 (1977), the Court held that

> [o]nce it is thus shown that the employment standards are discriminatory in effect, the employer must meet "the burden of showing that any given requirement (has) . . . a manifest relationship to the employment in question." If the employer proves that the challenged requirements are job related, <u>the plaintiff may then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest . . . ."</u>

<u>Id.</u> at 329 (quoting <u>Griggs</u>, 401 U.S. at 432, and <u>Albemarle</u>, 422 U.S. at 425) (internal citations omitted) (emphasis added); <u>see also</u> <u>Connecticut v. Teal</u>, 457 U.S. 440, 447 (1982) (stating that a Title VII plaintiff may still prevail after an employer-

---

[9]    This passage from <u>Albemarle</u> demonstrates that a Title VII disparate impact plaintiff has the right, but not the obligation, to respond with evidence of acceptable alternative practices when a defendant makes a showing of business necessity.

defendant's showing of business necessity "if he shows that the employer was using the practice as a mere pretext for discrimination").  This plain and repeated direction from the Supreme Court, which Congress expressly intended to revive, is echoed in the plain language of the governing statute: the burden of demonstrating the existence of acceptable alternative business practices rested and continues to rest squarely upon Title VII plaintiffs.[10]

The district court departed from this standard and erred by

---

[10]    Only a handful of appellate opinions address this issue; as one of our sister circuits has noted, very few courts of appeals have dealt with the allocation of disparate impact burdens as modified by the 1991 Civil Rights Act, and those "that have applied the Act's standard to a Title VII challenge have done so with little analysis."  Lanning v. Se. Pa. Transp. Auth., 181 F.3d 478, 488 (3d Cir. 1999).  In fact, at least one of our sister circuits has arrived at precisely the opposite interpretation that we reach today, concluding that the 1991 Civil Rights Act somehow imposed the burden on an employer-defendant to show "the lack of an effective alternative policy that would not produce a similar disparate impact."  Bradley v. Pizzaco of Neb., Inc., 7 F.3d 795, 797 (8th Cir. 1993); see also Davey v. City of Omaha, 107 F.3d 587, 591-92 (8th Cir. 1997) (quoting Bradley).
    Our contrary interpretation accords with the interpretations of the Third and Eleventh Circuits.  In Lanning, the Third Circuit applied the 1991 Civil Rights Act and held that when an employer meets its burden of demonstrating business necessity, Title VII disparate impact "plaintiffs may still prevail if they can show that an alternative employment practice has a less disparate impact and would also serve the employer's legitimate business interest."  181 F.3d at 485.  Similarly, the Eleventh Circuit has applied the 1991 Civil Rights Act and held that a Title VII disparate impact "plaintiff may still overcome a proffered business necessity defense by demonstrating that there exist alternative policies with less discriminatory effects that would be comparably as effective."  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1118 (11th Cir. 1993).

imposing the burden of demonstrating the <u>absence</u> of acceptable alternative employment practices upon the <u>defendant</u>, MP&L. Shortly before ruling for the Plaintiffs, the district court stated that

> the business justification evidence offered by the defendant . . . must justify an employer's use of the practice in question <u>and establish that there are no alternative practices that would achieve the same business ends</u>, with less racial impact. Certainly, the defendant most adequately has justified the practice of testing, and the validity of the CAB as a useful tool for the purpose of selecting applicants for clerkship positions. The only question to be resolved is whether the legitimate business purpose can be achieved only by establishing and maintaining a cutoff score of 180. This court is not persuaded that <u>this</u> cut-off score is the only way to achieve the defendant's desired ends.

<u>Local Union Nos. 605/985, Int'l Bhd. of Elec. Workers v. Miss. Power & Light Co.</u>, No. 3:96-CV-572-WS, at 46 (S.D. Miss. Sept. 30, 2004) (mem.) (internal citations omitted) (emphasis added). This excerpt shows both that the district court erred and that this error had a substantial effect upon the district court's ultimate conclusions. But for this error of law, the district court apparently would have been persuaded that MP&L had "most adequately" provided an acceptable business justification for its challenged business practices. <u>See</u> <u>id.</u>

After reviewing the record, we agree with the district court's conclusion that the Plaintiffs succeeded in establishing a prima facie case of disparate impact, and MP&L does not argue otherwise. We also conclude that MP&L adequately demonstrated

10

that its challenged business practices were both job related and consistent with business necessity. MP&L showed that increasing the CAB cutoff score to 180 from 150 significantly increases the likelihood that successful applicants for the positions in question will develop into proficient employees.[11] These differences have great value: MP&L can and has pointed to specific and sizable savings estimates related to its challenged practices.

Finally, we conclude that the Plaintiffs failed to respond to MP&L's demonstration of business necessity because they failed to provide any meaningful showing of acceptable alternative employment practices, as they might have done in accordance with § 2000e-2(k)(1)(A)(ii) and the clear direction of the Supreme Court. MP&L's brief to this court states flatly that "[t]he Plaintiffs did not offer any proof of an alternative employment practice." The Plaintiffs' brief does not respond to that statement or even address alternative employment practices. The court inquired at oral argument whether alternative employment practices evidence had been presented in the district court. Plaintiffs' counsel claimed that Plaintiffs' expert provided

---

[11] More specifically, MP&L's expert demonstrated that an applicant with a score of 180 on the CAB has almost a 50% chance of developing into an above-average worker, and only a 31% chance of winding up in the bottom third of all workers. On the other hand, an applicant scoring 150 on the CAB is equally likely (at 39%) to develop into an above-average employee or to wind up in the bottom third of all employees.

11

evidence of acceptable alternative practices by describing a process in which MP&L might require applicants to perform sample Storekeeper tasks, perhaps during the course of an interview. While acknowledging that this showing was not particularly "precise," Plaintiffs' counsel argued that it was sufficiently specific to meet the Plaintiffs' burden of demonstrating acceptable alternative employment practices. We cannot agree.

After reviewing the transcript of his testimony, which runs for over 250 pages, we have found only two instances in which Plaintiffs' expert mentioned such an alternative, and we note that Plaintiffs' expert even declined to specify whether such a "structured interview" would involve written or oral questions. We need not and do not decide whether a more substantial showing would demonstrate that such hiring practices constituted an acceptable alternative to the challenged practices at issue. We simply conclude that the Plaintiffs' presentation was so tenuous that it cannot, in any meaningful sense of the word, be considered an "alternative" to the testing practices that MP&L has shown were justified by business necessity. Therefore, we hold that the Plaintiffs failed to show that MP&L's employment policies constituted unlawful employment practices based on disparate impact under Title VII.

### III. CONCLUSION

For the reasons stated above, we REVERSE and RENDER judgment

12

in favor of the defendant-appellant, VACATING both the district court's restraint upon the challenged employment practices and the district court's award of lost wages and attorneys' fees to the plaintiffs-appellees.  Costs in the district court and in this court shall be borne by the plaintiffs-appellees.