**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-2323

JAY J. BAUER,

Plaintiff – Appellee,

v.

LORETTA E. LYNCH, Attorney General, Department of Justice,

Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, Senior District Judge. (1:13-cv-00093-TSE-JFA)

Argued: September 15, 2015      Decided: January 11, 2016

Before KING and HARRIS, Circuit Judges, and George J. HAZEL, United States District Judge for the District of Maryland, sitting by designation.

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Harris and Judge Hazel joined.

**ARGUED:** Charles W. Scarborough, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Michelle Reese Andrew, ANDREW LAW GROUP LLC, Wilmette, Illinois, for Appellee. **ON BRIEF:** Dana J. Boente, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Marleigh D. Dover, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Paul K. Vickrey, NIRO, HALLER & NIRO,

Chicago, Illinois; Craig C. Reilly, Alexandria, Virginia, for Appellee.

————————

KING, Circuit Judge:

For more than ten years, the FBI has measured the physical fitness of its New Agent Trainees ("Trainees") by using gender-normed standards. In July 2009, plaintiff Jay J. Bauer flunked out of the FBI Academy after falling a single push-up short of the thirty required of male Trainees. Bauer then filed this Title VII civil action, alleging that the FBI had discriminated against him on the basis of sex, in that female Trainees were required to complete only fourteen push-ups. The Attorney General and Bauer filed cross-motions for summary judgment, and the district court granted Bauer's motion. See Bauer v. Holder, 25 F. Supp. 3d 842 (E.D. Va. 2014). The Attorney General has appealed and, as explained below, we vacate and remand.

I.

A.

The FBI trains its Special Agent recruits at the FBI Academy in Quantico, Virginia.[1] The twenty-two week program consists of four main components that assess Trainees' proficiency and suitability for FBI service, each of which must

---

[1] Because we are reviewing the district court's award of summary judgment to Bauer, we recount the facts in the light most favorable to the Attorney General. See Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

be successfully completed to graduate from the Academy: academics; firearms training; practical applications and skills; and defensive tactics and physical fitness. Various assessment tools are used to ensure that Trainees demonstrate adequate proficiency in each component of the Academy's curriculum. For example, academic training requires successful completion of a series of written examinations. Firearms training requires attendance at training sessions and the successful completion of marksmanship qualifications. Of importance here, all Trainees must pass a physical fitness test (the "PFT").

According to the FBI, Trainees must pass the PFT and thereby demonstrate their physical fitness for two primary reasons. First, a basic level of physical fitness and conditioning leads to strong and injury-free performance at the Academy. Second, physical fitness supports effective training and application of the elements taught within the defensive tactics program, which include self-defense, combat, and restraining techniques. The FBI developed the PFT to ensure that those aims would be satisfied and to identify the Trainees who possess the initiative and perseverance required of a Special Agent. The FBI requires every Special Agent recruit to pass the PFT twice: once to gain admission to the Academy, and a second time to graduate.

The FBI has not always utilized the current version of the PFT. Prior to 2004, prospective Trainees proved themselves physically fit for admission to the Academy by completing a timed 1.5-mile run. Once at the Academy, Trainees were required to pass a five-part test, comprised of pull-ups, sit-ups, push-ups, a 120-yard shuttle run, and a two-mile run. Despite the use of the 1.5-mile run as an admissions requirement, physically unfit Trainees sometimes gained admission to the Academy. As a result, some Trainees suffered injuries, and the Academy's instructors spent substantial time coaching Trainees into shape rather than focusing on the Academy's curriculum. Moreover, because the five-part test had not been formally validated as a physical fitness assessment, the FBI would not dismiss Trainees solely for failing it. Accordingly, in 2003, the FBI decided to develop the PFT, which would be used as a requirement for both admission to and graduation from the Academy, and could be validated as a reliable assessment tool for personnel decisions.

To design the new testing protocol, the FBI considered a list of more than 200 essential tasks of the Special Agent position and determined that nearly half of those tasks related directly to overall physical fitness. Supervisory agents in charge of physical training at the Academy offered expertise regarding the types of training events that best served as indicators of Trainees' overall levels of physical fitness. The

5

FBI also considered standards of the exercise physiology industry. Those deliberations led to the selection of four events, to be completed in a single test in the following sequence: one minute of sit-ups; a 300-meter sprint; push-ups to exhaustion; and a 1.5-mile run. The events required Trainees to demonstrate baseline levels of fitness in core muscle strength and endurance, short-term physical power and speed, upper body strength and endurance, and aerobic capacity and endurance, respectively.

With the battery of events selected, the FBI evaluated and developed the minimum standards that Trainees would be required to satisfy in order to pass the PFT. To that end, the FBI implemented the PFT as a pilot program in each of its seven 2003 Academy classes and analyzed the results (the "Pilot Study"). The Pilot Study consisted of 322 Trainees — 258 men and 64 women — who completed the PFT during their first week at the Academy. The Pilot Study results were then subjected to thorough statistical analyses and standardized so that the FBI could compare Trainees both within and across the four events.

As a part of the statistical standardization, the FBI sought to normalize testing standards between men and women in order to account for their innate physiological differences. The FBI reasoned that, due to such distinctions, equally fit men and women would perform differently in the same events.

6

Accordingly, the FBI determined that male and female Trainees would be required to complete the four PFT events, but that different minimum standards would be established for each sex. The FBI concluded that use of such a gender-normed framework would have the complementary benefits of allowing the measurement of equivalent fitness levels between men and women while also mitigating the negative impact that would otherwise result from requiring female Trainees to satisfy the male-oriented standards. The practice also aligned with the FBI's use of gender-normed standards on the predecessor 1.5-mile run and five-part test.

After assessing the Pilot Study's results, the FBI computed the mean result and standard deviations therefrom in each event for each sex. Using that data, the FBI applied a point system to score each of the four events. For each event, Trainees could score one point for achieving the minimum standard, three points for achieving the Pilot Study's mean, and four or more points for above-average achievement, with a maximum of ten points. To successfully complete the PFT, Trainees had to score at least twelve points across all four events, with at least a single point earned in each event. That scoring system allowed Trainees who could demonstrate only a minimum, below-average level of fitness in one event to compensate by demonstrating above-average fitness in other events.

7

To receive the minimum passing score in each of the four events, Trainees would need to satisfy the following standards, which were fixed at one standard deviation below the Pilot Study's mean result for each sex:

| Event | Men | Women |
|---|---|---|
| Sit-ups | 38 | 35 |
| 300-meter sprint | 52.4 seconds | 64.9 seconds |
| Push-ups | 30 | 14 |
| 1.5-mile run | 12 minutes, 42 seconds | 13 minutes, 59 seconds |

The foregoing standards reflected the Pilot Study's results for the fifteenth percentile in each event, that is, eighty-five percent of Trainees were expected to earn at least one point in each event. Within the push-up event, the FBI found that 84.3% of male Trainees and 84.1% of female Trainees in the Pilot Study achieved the minimum passing score or better. Finding the discrepancy between the passage rates statistically insignificant, the FBI concluded that men and women of equal fitness levels were equally likely to pass the PFT. Beginning in 2004, the FBI adopted the PFT both as an Academy admission criterion and as a graduation requirement for its Trainees.

In early 2005, the FBI conducted a second study, evaluating its continued use of the PFT (the "Follow-up Study"). The Follow-up Study analyzed the results from the six 2004 Academy classes and compared them to those from the 2003 Pilot Study. The results of the Follow-up Study showed that male and female Trainees continued to pass the PFT at equivalent rates. More

8

specifically, by the seventh week of the 2004 classes, 90.2% of male Trainees and 89.5% of female Trainees passed the PFT. Like the marginal difference in passage rates in the Pilot Study, the FBI deemed the slight discrepancy in the Follow-up Study to be statistically insignificant. The Follow-up Study also revealed that the 2004 Trainees had passed the PFT at a higher rate than the 2003 Trainees, suggesting that the PFT was not as challenging as initially envisioned. Notwithstanding that revelation, the FBI kept the Pilot Study's standards in place and continued to use the PFT as a screening test and Academy graduation requirement.

B.

After the attacks of September 11, 2001, plaintiff Jay J. Bauer resolved to contribute to the defense of our country by becoming a Special Agent in the FBI. Having earned a master's degree in speech language pathology from Northwestern University, he applied to the FBI in 2001, but was rejected due to insufficient work experience. Bauer then continued his studies and earned a Ph.D. in human communication sciences from Northwestern in 2004. He subsequently served as an assistant professor at the University of Wisconsin-Milwaukee.

When Bauer reapplied to the FBI in 2008, it was interested in his application. Bauer moved through the applicant screening process with relative ease, passing written tests, completing

9

interviews, and satisfying the requisite background checks. Then the time came for him to successfully complete the PFT to gain admission to the Academy. In October 2008, Bauer took the PFT for the first time and failed. Although he achieved sixteen points on the test, Bauer completed only twenty-five push-ups, five short of the minimum required. The FBI allowed Bauer to retest in January 2009, and he passed, that time completing thirty-two push-ups. With his fitness screening complete, the FBI invited Bauer to report to the Academy on March 1, 2009. Bauer thus resigned his university position and went to Quantico to train with the FBI.

Bauer's time at the Academy largely showed great potential for a career as a Special Agent. He passed all academic tests, demonstrated proficiency in his firearms and defensive tactics training, and met all expectations for the practical applications and skills components of the Academy. Bauer's classmates also selected him as the class leader and spokesperson for the Academy graduation. Unfortunately, Bauer faced a dilemma: he was unable to pass the PFT at Quantico.

During his twenty-two weeks at the Academy, Bauer took the PFT five times. On each occasion, he would have passed but for his failure to achieve the minimum standard for push-ups. Bauer's results, and his corresponding point scores for each event, were as follows:

| Week | Sit-ups | 300-meter sprint | Push-ups | 1.5-mile run | Total Points |
|---|---|---|---|---|---|
| Week 1 | 40 (2) | 42.6 sec. (8) | 26 (0) | 10:49 (4) | 14 |
| Week 7 | 47 (4) | 43.4 sec. (7) | 25 (0) | 10:24 (5) | 16 |
| Week 14 | 50 (6) | 43.7 sec. (7) | 28 (0) | 10:45 (4) | 17 |
| Week 18 | 51 (6) | 43.8 sec. (7) | 27 (0) | 11:09 (4) | 17 |
| Week 22 | 49 (5) | 44.1 sec. (6) | 29 (0) | 10:57 (4) | 15 |

Following his final failure of the PFT, Bauer met with Academy officials to assess his situation.  He was given three options:  (1) resign with the possibility of future employment with the FBI; (2) resign permanently; or (3) be fired.  Bauer chose the first option and immediately signed a resignation letter.  Two weeks later, the FBI offered Bauer a position as an Intelligence Analyst in its Chicago Field Office.  He accepted and has been employed in that position since 2009.

C.

On April 2, 2012, Bauer filed this Title VII action in the Northern District of Illinois against the Attorney General.[2] According to the claims in Bauer's complaint, the FBI's use of the gender-normed PFT standards contravened two of Title VII's

---

[2]  Pursuant to 42 U.S.C. § 2000e-16(c), Title VII discrimination claims against federal employers may be pursued against "the head of the department."  The Attorney General heads the Department of Justice, which includes the FBI.  See 28 U.S.C. §§ 503, 531.

provisions: 42 U.S.C. § 2000e-16(a), which prohibits sex discrimination by federal employers[3]; and 42 U.S.C. § 2000e-2(*l*), which prohibits the use of different cutoff scores on employment tests on the basis of sex.[4] On January 4, 2013, the Illinois district court granted the Attorney General's motion to transfer these proceedings to the Eastern District of Virginia.

On November 8, 2013, the Attorney General and Bauer filed cross-motions for summary judgment, supported by voluminous exhibits. In addition to evidence memorializing the FBI's development of the PFT, the parties presented reports from various experts and sworn statements from individuals involved in the FBI's statistical analyses of its fitness testing and in the implementation of the PFT at the Academy. To further assist

---

[3] Rather than correctly specifying 42 U.S.C. § 2000e-16(a), Bauer's complaint alleged a violation of 42 U.S.C. § 2000e-2(a), which deals with discrimination in the private sector. Moreover, the district court analyzed his claim under § 2000e-2(a). That is of no moment, however, as we have treated §§ 2000e-2(a) and 2000e-16(a) as comparable, with the liability standards governing the former being applicable to the latter. See, e.g., Brown v. Perry, 184 F.3d 388, 393-94 (4th Cir. 1999) (applying private-sector Title VII principles to discrimination claim against federal employer).

[4] Section 2000e-(2)(*l*)'s discriminatory cutoff score prohibition applies to "a respondent," which includes a "Federal entity subject to section 2000e-16." See 42 U.S.C. § 2000e(n).

the district court, Bauer and the Attorney General submitted a document called a "Joint Statement of Facts."[5]

In his summary judgment motion, Bauer maintained that the FBI's use of the gender-normed PFT standards was facially discriminatory, and that the FBI could not justify their use under any lawful defense to Title VII liability. The Attorney General's summary judgment motion, on the other hand, contended that the gender-normed PFT standards do not discriminate against male Trainees, in that the standards impose equal burdens of compliance on both sexes.[6]

---

[5] Although nominally entitled as a "Joint Statement of Facts," only the first ten of the sixty-six pages of that submission by the parties contained undisputed facts. Those ten pages recounted general facts about the Special Agent and Intelligence Analyst positions, Bauer's application to the FBI, the Academy curriculum, and Bauer's performance at the Academy and his PFT results. After the first ten pages, Bauer offered twenty-six pages of his "undisputed facts" that the Attorney General either admitted with some qualifications or deemed immaterial, irrelevant, or otherwise disputed. Thereafter the Attorney General offered thirty pages of her own "undisputed facts," which Bauer likewise admitted with qualifications or deemed immaterial, irrelevant, or otherwise disputed.

[6] In her summary judgment request, the Attorney General also asserted that, because Bauer had chosen to resign from the Academy, he had not faced an adverse employment action and thus could not prove employment discrimination. The district court rejected that contention, concluding that the FBI had forced Bauer to choose between termination and resignation. See Bauer, 25 F. Supp. 3d at 853-54. The Attorney General does not challenge that ruling on appeal.

D.

By its decision of June 10, 2014, the district court agreed with Bauer, granting his motion for summary judgment and denying the Attorney General's. See Bauer, 25 F. Supp. 3d at 865. The court ruled that, because Bauer would have been required to do fewer push-ups had he been a woman, the gender-normed PFT standards contravene Title VII's prohibition of sex discrimination. See id. at 856. For the same reason, the court determined that the standards run afoul of Title VII's bar against the use of different cutoff scores on employment tests. See id. at 859.

Having concluded that the PFT standards facially discriminate on the basis of sex, the district court sua sponte examined whether the Attorney General nonetheless possessed a legal defense to Title VII liability under two potential exceptions. More specifically, the court considered the applicability of Title VII's bona fide occupational qualification defense (the "BFOQ defense"), which allows for differential treatment of men and women if sex "is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." See 42 U.S.C. § 2000e-2(e). The court also assessed whether the PFT standards could survive under the defense outlined by the Supreme Court in Ricci v. DeStefano (the "Ricci defense"), which

14

permits disparate treatment on the basis of a statutorily protected trait (such as sex) where the employer has "a strong basis in evidence to believe it will be subject to disparate-impact liability" unless it takes discriminatory action. See 557 U.S. 557, 585 (2009). Ultimately, the district court rejected the BFOQ and Ricci defenses. See Bauer, 25 F. Supp. 3d at 860 & n.30, 864.[7] Accordingly, the court ruled that the Attorney General was liable to Bauer for sex discrimination in the FBI's use of the gender-normed PFT standards.[8]

## II.

The Attorney General has filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo a district court's award of summary judgment, viewing the facts in the light most favorable to the nonmoving

---

[7] The Attorney General did not pursue either the BFOQ defense or the Ricci defense in the district court proceedings. As explained at oral argument, she declined to concede that the PFT standards treated male and female Trainees unequally.

[8] By its subsequent remedial order, the district court awarded Bauer back pay and damages and directed the FBI to reinstate him as a Special Agent. See Bauer v. Holder, No. 1:13-cv-00093 (E.D. Va. Oct. 3, 2014), ECF No. 157. The court also barred the FBI from requiring Bauer to complete the Academy training program again, although it authorized the FBI to impose supplemental training and an age-related physical fitness test. On December 8, 2014, we stayed the remedial order pending this appeal.

party.  See Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 276 (4th Cir. 2015) (en banc).  Summary judgment is not appropriate unless the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a).

III.

A.

The Attorney General contends on appeal that the district court erred in granting summary judgment to Bauer, in that the court applied an incorrect legal rule to its assessment of the FBI's use of the gender-normed PFT standards.  Bauer responds that the court applied the correct rule and rightly concluded that the gender-normed PFT standards constitute sex discrimination under Title VII.[9]  Because this appeal involves a

---

[9] We have recognized that, although "it may be useful to disaggregate the definition of 'gender' from 'sex' for some purposes" — the former referring to "cultural or attitudinal characteristics distinctive to the sexes, as opposed to their physical characteristics" — courts have frequently "used the term 'sex' and 'gender' interchangeably to refer simply to the fact that an employee is male or female."  See Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 749 n.1 (4th Cir. 1996).  Both biological and cultural differences can give rise to Title VII sex discrimination.  See Price Waterhouse v. Hopkins, 490 U.S. 228, 250-51 (1989) (plurality opinion).  Although the FBI's normalized standards are based on biological differences, we use the term "gender-normed standards" to be consistent with the parties' use of that term.  The term refers to standards like those used in the PFT, which are differentiated based on sex, (Continued)

16

relatively novel issue, we will first identify some pertinent legal authorities, including those on which the Attorney General relies.

1.

Title VII requires that any "personnel actions affecting employees or applicants for employment" taken by federal employers "shall be made free from any discrimination based on . . . sex." 42 U.S.C. § 2000e-16(a). That proscription against sex discrimination also extends to the use of "different cutoff scores for . . . employment related tests." Id. § 2000e-2(*l*). A plaintiff is entitled to demonstrate discrimination by showing that the employer uses a facially discriminatory employment practice. In 1978, the Supreme Court outlined in its Manhart decision what it called a "simple test" for identifying facial sex discrimination: such discrimination appears "where the evidence shows treatment of a person in a manner which but for that person's sex would be different." See City of Los Angeles, Dep't of Water & Power v. Manhart, 435 U.S. 702, 711 (1978) (internal quotation marks omitted); see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v.

---

but intended to be equivalent as between men and women. Meanwhile, we use the term "sex discrimination" to describe the conduct proscribed by Title VII.

Johnson Controls, Inc., 499 U.S. 187, 200 (1991) (explaining Manhart's "simple test" in sex discrimination litigation).

In this proceeding, the district court applied the Manhart test and concluded that, because Bauer would have been held to a lower minimum number of push-ups had he been a woman, the gender-normed PFT standards constitute facial sex discrimination. The Attorney General maintains on appeal, however, that because the PFT assesses an overall level of physical fitness, and equally fit men and women possess innate physiological differences that lead to different performance outcomes, the PFT's gender-normed standards actually require the same level of fitness for all Trainees. In that way, the Attorney General contends, the PFT standards do not treat the sexes differently and therefore do not contravene Title VII.

2.

Among the few decisions to confront the use of gender-normed physical fitness standards in the Title VII context, none has deemed such standards to be unlawful. Of those decisions, the Attorney General primarily relies on Powell v. Reno, No. 96-2743, 1997 U.S. Dist. LEXIS 24169 (D.D.C. July 24, 1999), and Hale v. Holder, EEOC Dec. No. 570-2007-00423X (Sept. 20, 2010). Of note, Powell and Hale specifically addressed and approved of the FBI's use of gender-normed standards at the Academy and thus bear directly on this appeal. Those decisions, in turn, relied

18

largely on the Ninth Circuit's en banc decision in <u>Gerdom v. Continental Airlines, Inc.</u>, 692 F.2d 602 (9th Cir. 1982) (en banc), <u>cert. denied</u>, 460 U.S. 1074 (1983).

In <u>Powell</u>, the district court assessed the FBI's pre-PFT, five-part test as part of a Title VII action that was similar to Bauer's. <u>See</u> 1997 U.S. Dist. LEXIS 24169, at *1. Powell had failed to meet the standards for male Trainees, but contended that he may have passed the test had the FBI applied the "less stringent standards" that applied to female Trainees. <u>Id.</u> at *9. By its 1997 decision, the court rejected that proposition and explained that "Title VII allows employers to make distinctions based on undeniable physical differences between men and women . . . where no significantly greater burden of compliance [is] imposed on either sex." <u>Id.</u> at *9-10 (internal quotation marks omitted). Recognizing that physiological differences between the sexes "result in males and females of similar fitness levels performing differently on physical tests," the <u>Powell</u> court concluded that the FBI's gender-normed standards accounted for those differences and did not constitute sex discrimination. <u>Id.</u> at *11.

In <u>Hale</u> — a more recent proceeding before the Equal Employment Opportunity Commission (the "EEOC") — the complainant pursued a Title VII claim nearly identical to the one that Bauer sponsors: that of a male New Agent Trainee who failed to meet

19

the PFT's current male standards.  See EEOC Dec. No. 570-2007-00423X, slip op. at 2.  Hale contended that the FBI "held females to less rigorous physical requirements than males" and thus violated Title VII's proscription against sex discrimination.  Id. at 4.  The administrative law judge adopted the approach taken by the Powell court and recognized that "distinctions based on the obvious physical differences between men and women" do not per se contravene Title VII.  Id. at 4-5. Concluding that the PFT did not impose unequal burdens on either sex, the ALJ rejected Hale's discrimination claim.

Finally, Gerdom involved a Title VII challenge by female flight attendants against their employer's allegedly discriminatory weight-limit policy.  As relevant here, the court of appeals recognized that "physiologically based policies which set a higher maximum weight for men than for women of the same height" would be permissible because "no significantly greater burden of compliance was imposed on either sex."  Id. at 606. That decision has been applied in the Ninth Circuit to challenges against policies regarding weight and appearance requirements.  See, e.g., Jespersen v. Harrah's Operating Co., Inc., 444 F.2d 1104, 1109 (9th Cir. 2006) (en banc).  The Powell and Hale decisions each applied Gerdom's "equally burdensome" test and concluded that the FBI's gender-normed physical fitness benchmarks did not violate Title VII because they imposed equal

20

burdens of compliance on men and women.  See Powell, 1997 U.S. Dist. LEXIS 24169, at *10-11 (citing Gerdom, 692 F.2d at 606); Hale, EEOC Dec. No. 570-2007-0423X, slip op. at 6 (same).

3.

Among several other authorities relied upon by the Attorney General, she emphasizes two:  one from the Supreme Court and the other from the Third Circuit.  See United States v. Virginia ("VMI"), 518 U.S. 515 (1996); Lanning v. Se. Pa. Transp. Auth., 181 F.3d 478 (3d Cir. 1999).  Although neither decision directly addressed the Title VII facial discrimination theory pursued by Bauer, the Attorney General posits that both provide insight into when an employer can consider the physiological differences between the sexes.

In the VMI case, the Supreme Court ruled that Virginia had violated the Equal Protection Clause by excluding women from admission to its all-male military academy.  In recognizing the realities of coeducation, the Court explained "that women's admission would require accommodations, primarily in arranging housing assignments and physical training programs for female cadets."  518 U.S. at 540 (emphasis added).  The Court also observed by footnote that "[a]dmitting women to VMI would undoubtedly require alterations necessary . . . to adjust aspects of the physical training programs."  Id. at 550 n.19. In support of that proposition, the Court relied on the

21

statutory notes placed by Congress into 10 U.S.C. § 4342, which in turn explained that the "academic and other standards" for women admitted to the various service academies "shall be the same as those required for male individuals, except for those minimum essential adjustments in such standards required because of physiological differences between male and female individuals." Id. The Attorney General thus maintains that the VMI decision shows "that some differential treatment of men and women based upon inherent physiological differences is not only lawful but also potentially required." Br. of Appellant 29.

In Lanning, the Third Circuit analyzed a Title VII disparate impact challenge made by female applicants for transit officer positions with the Philadelphia transit authority. See 181 F.3d at 484.[10] The applicants challenged the transit authority's use of a twelve-minute cutoff requirement for a 1.5-mile run on the basis that female applicants failed at rates disproportionately higher than their male counterparts. See id. at 492-93. The Third Circuit vacated a ruling in favor of the transit authority and remanded to the district court for application of the business necessity defense, which it

---

[10] As the Supreme Court has recognized, disparate impact discrimination occurs when a facially neutral employment practice has a significantly discriminatory effect. See Griggs v. Duke Power Co., 401 U.S. 424, 430 (1971).

22

explained thusly: "a discriminatory cutoff score [must] be shown to measure the minimum qualifications necessary for the successful performance of the job in question in order to survive a disparate impact challenge." Id. at 490.

If the transit authority could not show that the twelve-minute standard represented the minimum qualification to be a transit officer, and the authority nevertheless wanted to ensure aerobic fitness in its officers, Lanning offered by footnote a suggestion: "institute a non-discriminatory test for excessive levels of aerobic capacity such as a test that would exclude 80% of men as well as 80% of women through separate aerobic capacity cutoffs for the different sexes." 181 F.3d at 490 n.15. As the Third Circuit explained, such a solution would achieve the transit authority's fitness goals "without running afoul of Title VII." Id. The Attorney General thus contends that Lanning expressly endorsed the use of gender-normed physical fitness standards under Title VII.

B.

Having considered the foregoing authorities, we must ascertain and identify the rule that is applicable in this proceeding. The district court rejected the FBI's contention that the "no greater burden" test espoused by the Ninth Circuit in Gerdom, and applied by Powell and Hale, authorized the use of the gender-normed PFT standards at the Academy. Instead, the

23

district court relied on the plain language of Title VII and Manhart's "simple test" for sex discrimination, explaining that, but for Bauer's sex, he would have been required to complete fourteen push-ups instead of thirty. On that basis, the court concluded that the gender-normed standards constitute sex discrimination in contravention of Title VII. We are constrained to disagree.

Men and women simply are not physiologically the same for the purposes of physical fitness programs. The Supreme Court recognized as much in its discussion of the physical training programs addressed in the VMI litigation, albeit in the context of a different legal claim than that presented today. The Court recognized that, although Virginia's use of "generalizations about women" could not be used to exclude them from VMI, some differences between the sexes were real, not perceived, and therefore could require accommodations. See VMI, 518 U.S. at 550 & n.19. To be sure, the VMI decision does not control the outcome of this appeal. Nevertheless, the Court's observation therein regarding possible alterations to the physical training programs of the service academies informs our analysis of Bauer's Title VII claims. That is, physical fitness standards suitable for men may not always be suitable for women, and accommodations addressing physiological differences between the sexes are not necessarily unlawful. See Lanning, 181 F.3d at

24

490 n.15 (suggesting that use of gender-normed cutoff scores for aerobic capacity would not contravene Title VII); see also Michael M. v. Superior Court of Sonoma Cty., 450 U.S. 464, 469 (1981) (plurality opinion) ("[T]his Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances.").

At bottom, as the Powell and Hale decisions recognized, the physiological differences between men and women impact their relative abilities to demonstrate the same levels of physical fitness.  In other words, equally fit men and women demonstrate their fitness differently.  Whether physical fitness standards discriminate based on sex, therefore, depends on whether they require men and women to demonstrate different levels of fitness.  A singular focus on the "but for" element of Bauer's claim offers the obvious conclusion that the numbers of push-ups men and women must complete are not the same, but skirts the fundamental issue of whether those normalized requirements treat men in a different manner than women.  In recognition of that distinction, we agree with the rule enunciated in Powell and in Hale.

Put succinctly, an employer does not contravene Title VII when it utilizes physical fitness standards that distinguish between the sexes on the basis of their physiological

25

differences but impose an equal burden of compliance on both men and women, requiring the same level of physical fitness of each. Because the FBI purports to assess physical fitness by imposing the same burden on both men and women, this rule applies to Bauer's Title VII claims. Accordingly, the district court erred in failing to apply the rule in its disposition of Bauer's motion for summary judgment.

## C.

Although Bauer has consistently opposed the rule we adopt today, he has argued in the alternative, both on appeal and in the district court, that the rule does not preclude a summary judgment award in his favor.[11] At the same time, the Attorney General urges — under our new rule — that we direct an award of summary judgment to her. Because the district court did not address either Bauer's alternative contention or the Attorney General's summary judgment request, we must decide whether to address those matters in the first instance.

---

[11] As his alternative basis for summary judgment, Bauer makes a three-pronged argument. First, he contends that the gender-normed PFT standards are not predicated on any physiological differences between the sexes. Second, he maintains that the standards impose an undue burden of compliance on male Trainees compared to female Trainees. Third, he contends that the standards are not consistent with the minimum performance requirements for Special Agents of the FBI.

26

We are not restricted to resolving an appeal solely on the grounds relied on by the district court. Indeed, we can "affirm on any legal and factual basis fairly presented in the district court and preserved for review." PHP Healthcare Corp. v. EMSA Ltd. P'ship, 14 F.3d 941, 945 (4th Cir. 1993). Furthermore, although the denial of a summary judgment request "is not independently reviewable," we can "review such an order when it is appealed with an order granting a cross-motion for summary judgment." Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen, 152 F.3d 283, 293 (4th Cir. 1998). And, if the facts are undisputed, "we are free to direct the entry of an order awarding summary judgment to the party whose motion was denied." Id.

This appeal presents an added layer of complexity, however, because the district court awarded summary judgment to Bauer on the basis of an erroneous legal standard. In such a circumstance, the better remedy is usually to remand "for a determination under the appropriate standard." See Humphrey v. Humphrey, 434 F.3d 234, 247 (4th Cir. 2006). That is certainly true here, where the resolution of Bauer's alternative contention and the Attorney General's summary judgment motion requires multiple analyses that the district court is better suited to undertake in the first instance. Of particular significance, there is the potential for problems in the summary

27

judgment record arising from the so-called "Joint Statement of Facts."  See supra note 5.  A remand to the district court is therefore our most prudent option.

IV.

Pursuant to the foregoing, we vacate the judgment of the district court and remand for such other and further proceedings as may be appropriate.

VACATED AND REMANDED